UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SEALED

UNITED STATES OF AMERICA

v.

PATSY TRUGLIA, and
RUTH BIANCA FERNANDEZ

CASE NO. 8:20-cr-58-T-33JSS

18 U.S.C. § 371
18 U.S.C. § 1035
18 U.S.C. § 1347
42 U.S.C. § 1320a–7b(b)(1)
42 U.S.C. § 1320a–7b(b)(2)

## INDICTMENT

The Grand Jury charges:

### COUNT ONE
### (Conspiracy)

#### A.    Introduction

At times material to this Indictment:

The Conspirators and Their Enterprises

*The Truglia Faction*

1.    The Truglia Faction, which included the defendants and others, owned, controlled, and managed a telemarketing operation in Florida. The Truglia Faction ran the operation by and through multiple companies, including, principally, (i) Med-Connect USA LLC ("Med-Connect"), and (ii) Global One Medical Solutions LLC ("Global One").

2.     Med-Connect, principally located in Broward County, Florida, was a call-center operation that targeted the Medicare-aged population. During calls, representatives purportedly inquired about, among other things, consumers' Medicare eligibility and their interest in receiving a brace or braces. Representatives harvested this information along with beneficiaries' personally identifying information ("PII") to begin forming orders for certain orthotic devices—including knee braces, back braces, shoulder braces, wrist braces, and other braces—referred to as "durable medical equipment" or "DME."

3.     While Med-Connect mainly contacted consumers through its call-center operation, Global One, which was located in Palm Beach County, Florida, was the corporate entity dealing with organizational clients. Global One sold the brace orders to organizational clients and others.

4.     The Truglia Faction also created, owned, controlled, and/or managed, in whole or in part, related purported "marketing" companies, including ASP Marketing Group, LLC ("ASP Marketing") and Global American Solutions USA LLC ("Global American").

5.     The Truglia Faction also controlled, owned, held financial interests in, and/or managed multiple Medicare-enrolled DME supply companies (the "DME Fronts") including: (i) Indian Shores Bracing, Inc.

("Indian Shores Bracing"); (ii) Village Medical Supply, Inc. ("Village Medical"); (iii) Cordial Medical Supply, Inc. ("Cordial Medical"); (iv) Self-Care Bracing, Inc. ("Self-Care Bracing"); and Tiger Medical, Inc. ("Tiger Medical").

6.     The Truglia Faction was comprised of the defendants, who are described in the following sub-paragraphs, and others.

a.     PATSY TRUGLIA resided in Broward County, Florida. TRUGLIA, in whole or in part, controlled, owned, held financial interests in, and/or managed the Truglia Faction's telemarketing operation and DME Fronts. He was a decision-maker for all of these businesses. In or about 2014, TRUGLIA was convicted of a federal felony crime, to wit, money laundering in violation of 18 U.S.C. § 1956(a) in the United States District Court for the Eastern District of New York. This felony conviction was within 10 years of the Truglia Faction's acquisition of multiple DME Fronts, which were placed in his wife's name, C.T.

b.     RUTH BIANCA FERNANDEZ resided in Broward County, Florida. FERNANDEZ managed the Truglia Faction's telemarketing operation and DME Fronts, including by exercising operational or managerial control over, and conducting the day-to-day operations of these businesses.

3

*The Regency Faction*

7.     Regency, Inc. ("Regency") was a DME billing and consulting company in Largo, Florida. Regency was owned and operated by K.W., who resided in Pinellas County, Florida. K.W. and others at Regency are collectively referred to as the Regency Faction.

8.     Regency's consulting services included, among other things, the creation and sale of "turn-key" DME supply companies to clients. As part of this service, Regency generally assisted clients with the accreditation and Medicare-enrollment processes. The Truglia Faction used these services to establish their DME Fronts.

9.     Other members of the Regency Faction included M.K. and S.P., who helped K.W. operate Regency. In or about March 2018, the Regency Faction incorporated Magic Medical Inc. ("Magic Medical") as a purported DME drop-shipping company in Largo, Florida. Magic Medical was non-operational.

*The Medicare Program*

10.     The Medicare Program ("Medicare") was a federal health care benefit program that provided items and services to individuals who were (a) age 65 or older, (b) had certain disabilities, or (c) had end-stage renal disease. Individuals who received Medicare benefits were called "beneficiaries."

4

11.     Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), which was an agency of the United States Department of Health and Human Services ("HHS").

12.     To help administer Medicare, CMS contracted with private insurance companies called "Medicare Administrative Contractors" or "MACs." MACs performed many functions, such as enrolling DME suppliers into the Medicare program and processing Medicare claims. In performing such functions, MACs were assigned to particular geographical "jurisdictions." For DME claims, they were called Jurisdictions A, B, C, and D.

13.     Medicare was made up of several component "parts" that covered different items and services. Medicare Part A, for example, covered inpatient hospital stays. Medicare Part B covered, among other items and services, outpatient care and supplies, including orthotic devices, referred to as DME (such as the braces referred to above in paragraph 2).

14.     Under Medicare Part B, beneficiaries could only receive Medicare-covered DME from "suppliers" that were enrolled in Medicare.

15.     Medicare claims for DME were processed by two MACs: (i) CGS Administrators, LLC ("CGS"), and (ii) Noridian Healthcare

Solutions ("Noridian"). Together, CGS and Noridian are referred to herein as the "DME MACs."

*Medicare Part B Enrollment: The Form CMS-855S*

16.    A different MAC, Palmetto GBA, LLC ("Palmetto"), handled the enrollment of DME suppliers into Medicare. Palmetto was the single entity responsible for, among other duties, issuing or revoking Medicare supplier billing privileges for DME suppliers. Palmetto was also referred to as the National Supplier Clearinghouse ("NSC") MAC for DME suppliers.

17.    To enroll in Medicare Part B, a DME supplier was required to submit a completed enrollment application—meaning the "Form CMS-855S"—to Medicare. The Form CMS-855S listed many standards necessary to obtain and to retain Medicare billing privileges as a DME supplier.

18.    Pursuant to those standards, a DME supplier was required to provide complete and accurate information on the Form CMS-855S and, further, report any changes to such information to the NSC MAC within 30 days. The standards also included the following requirements:

   a.    an authorized individual (one whose signature was binding) had to sign the application for billing privileges;

   b.    a DME supplier was prohibited from direct solicitation to Medicare beneficiaries;

c.    a DME supplier had to fill orders from its own inventory or, otherwise, was to contract with another company for the purchase of items to fill orders;

d.    a DME supplier had to maintain a staffed physical facility accessible to the public at least thirty hours per week, with visibly posted hours of operation;

e.    a DME supplier had to disclose any person having ownership, financial or control interest in the supplier DME;

f.    a DME supplier could not convey or reassign a supplier number (*e.g.*, the supplier may not sell or allow another entity to use its Medicare billing number); and

g.    a DME supplier had to be accredited by a CMS-approved accreditation organization in order to receive and retain a supplier billing number.

*Owners and Managers of DME Suppliers*

19.    The Form CMS-855S required applicants to disclose to Medicare any individual or organization with an ownership interest, a financial interest, or managing control of a DME supplier. This included (i) anyone with 5% or more of an ownership stake, either direct or indirect, in the DME supplier; (ii) anyone with a partnership interest in the DME supplier, regardless of the percentage of ownership, (iii) any organizations with "managing control" over the DME supplier, as well as (iv) any and all "managing employees."

20.    "Managing employee" was defined on the Form CMS-855S (and elsewhere) as any general manager, business manager, administrator, director,

or other individual who exercised operational or managerial control over, or who, directly or indirectly, conducted the day-to-day operations of the DME supplier. This included anyone under contract or through some other arrangement, whether or not the individual was a "W-2 employee."

21. The Form CMS-855S also called for extensive information regarding those who owned, managed, and/or controlled (financially or otherwise) the DME supplier. This information included the mandatory disclosure of "Adverse Legal Actions," which was defined to include, among other things, any federal or state felony conviction within 10 years.

*Certification by Authorized Official*

22. Finally, the Form CMS-855S required the signature of an "authorized official." The act of signing, or authorizing such signing, bound the DME supplier and official(s) to abide by all "laws, regulations, and program instructions" for Medicare. It also bound and certified the DME supplier and official(s) to the following terms, among others:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 1B of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions[,] including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a–7b(b)[.]

***

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*On-Site "BOC" and Medicare Inspections*

23.     To enroll in Medicare, a DME supplier was required to complete an accreditation process by an organization approved by CMS. One CMS-approved organization that could perform such accreditation was known as the Board of Certification/Accreditation or the "BOC." The BOC had a set of standards that a DME supplier had to meet for accreditation, which were tested at on-site inspections and random re-inspections.

24.     The NSC MAC also conducted surprise on-site inspections for Medicare enrollment, which helped verify information disclosed in the Form CMS-855S and supporting documents. A DME supplier's responses to the NSC MAC's on-site inspections were recorded, in part, on a Site Investigation for Suppliers of Durable Medical Equipment, Prosthetics, Orthotics and Supplies, Form CMS-R-263. An authorized site inspector would interview staff seeking, among other information, a complete list of all owners and managers and, further, whether they or any of their relatives owned other medical entities.

9

25. The NSC MAC inspection also involved a review of any on-site DME inventory. A DME supplier that did not maintain its own inventory could be asked to produce a contract with a third-party vendor, such as a DME "drop-shipping" company.

26. Further, the NSC MAC inspection inquired about marketing efforts including, pertinently, direct solicitation or the utilization of any third-party to solicit beneficiaries' referrals via telephone.

27. Finally, all Medicare-enrolled DME suppliers were subject to random re-inspections. During a re-inspection, an inspector could make the same inquiries noted above, request supporting documentation, and seek follow up information from the DME supplier. Failure to comply could result in the suspension or revocation of Medicare billing privileges.

*DME Suppliers' Unique Identification Numbers: NPIs and PTANs*

28. To bill Medicare, the DME supplier required two unique identification numbers: (i) a "National Provider Identifier" or "NPI," and (ii) a "Provider Transaction Access Number" or "PTAN." To issue NPIs, CMS developed the National Plan and Provider Enumeration System, which assigned NPIs to providers, including DME suppliers.

29. For PTANs, the NSC MAC was the entity responsible for issuing such identifiers to DME suppliers, but only after approving their Forms CMS-

855S. With both the PTAN and the NPI, DME suppliers could submit claims and receive payments from Medicare for braces and other equipment.

*DME Claims Submission under Medicare Part B*

30. Claims for DME supplies could be submitted for payment to the MAC through an "Electronic Data Interchange ("EDI") system. EDI was a computer-to-computer electronic exchange of business documents using a standard format. An EDI allowed a DME supplier the ability to transmit Electronic Media Claims ("EMC") to Medicare in a compliant format. Medicare, in turn, required that a DME supplier complete a Common Electronic Data Interchange ("CEDI") agreement for EDI services with a DME MAC. The CEDI agreement required the DME supplier to agree to several terms and conditions, including:

a. that it would be responsible for all Medicare claims submitted to CMS or a designated CMS contractor by itself, its employees, or its agents;

b. that it would submit claims only on behalf of those Medicare beneficiaries who had given their written authorization to do so, and certify that required beneficiary signatures, or legally authorized signatures on behalf of beneficiaries, were on file;

c. that it would submit claims that are accurate, complete, and truthful;

d. that it would affix the CMS-assigned unique identifier number (submitter ID) of the provider on each claim

electronically transmitted to the A/B MAC, CEDI, or other contractor if designated by CMS;

e.  that the CMS-assigned unique identifier number (submitter identifier) or NPI constituted the provider's (or the DME supplier's) legal electronic signature and its assurance that services were performed as billed; and

f.  that it would acknowledge that all claims would be paid from Federal funds, that the submission of such claims was a claim for payment under the Medicare program, and that anyone who misrepresented or falsified or caused to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement was, upon conviction, subject to a fine and/or imprisonment under applicable Federal law.

31.  Both methods of filing claims required the submission of certain information relating to a specific patient or beneficiary. The information necessary for a DME claim included:

a.  the type of service provided, identified by an "HCPCS" code (meaning "Healthcare Common Procedure Coding System");

b.  the date of service or supply;

c.  the referring physician's NPI;

d.  the charge for such services;

e.  patient's diagnosis;

f.  the NPI for the DME entity seeking reimbursement; and

g.  certification by the DME provider that the supplies are medically necessary.

32. Further, before submitting a claim for an orthotic brace to the DME MAC, a supplier was required to have on file the following:

a. written documentation of a verbal order or a preliminary written order from a treating physician;

b. a detailed written order from the treating physician;

c. information from the treating physician concerning the beneficiary's diagnosis;

d. any information required for the use of specific modifiers;

e. a beneficiary's written assignment of benefits; and

f. proof of delivery of the orthotic brace to the beneficiary.

33. Finally, under Medicare Part B, providers were not permitted to routinely waive copayments, which were the portion of the cost of an item paid by a beneficiary.

*Proper Telehealth Services for Medicare Beneficiaries*

34. Telemedicine was a means of connecting patients to providers via a telecommunication technology, such as video-conferencing. Telemedicine companies hired physicians and other providers to furnish telemedicine services to individuals. Telemedicine companies typically paid "treating providers" a fee to consult with patients. In order to generate revenue, telemedicine companies typically either billed the Medicare program or other health insurance program, or offered a membership program to patients.

35.     Some telemedicine companies offered membership programs to patients who signed a contract for telemedicine services, paid a set dollar amount per month, and paid a fee each time the patient had a telemedicine encounter with one of its providers.

36.     Medicare Part B covered expenses for specified telehealth services if certain requirements were met. These requirements included, among others: (a) that the beneficiary was typically located in a rural area (meaning, outside a "Metropolitan Statistical Area" or in a rural health professional shortage area); (b) that the services were delivered via an interactive audio- and video-telecommunications system; and (c) that the beneficiary was at a practitioner's office or a specified medical facility—not at home—during the telehealth service furnished by a remote practitioner.

*CHAMPVA*

37.     The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was a federal health benefit program. CHAMPVA was a comprehensive health care program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries. CHAMPVA beneficiaries included the spouses or children of veterans who had been rated permanently and totally disabled for a service-connected disability and the surviving spouses or children of veterans who had

14

died from VA-rated service-connected disabilities. In general, the CHAMPVA program covered most health care services and supplies that were medically necessary. CHAMPVA was always the secondary payer to Medicare and reimbursed beneficiaries for costs that Medicare did not cover. Health care claims must have first been sent to Medicare for processing. Medicare electronically forwarded claims to CHAMPVA after Medicare had processed them. For Medicare supplemental plans, CHAMPVA processed the remaining portion of the claim after receiving Medicare's explanation of benefits.

## B.    **The Conspiracy**

38.    Beginning in or about January 2018, and continuing until in or about April 2019, in the Middle District of Florida and elsewhere, the defendants,

PATSY TRUGLIA, and
RUTH BIANCA FERNANDEZ,

did knowingly and willfully combine, conspire, confederate, and agree with each other and with others, including K.W., S.P., and M.K., to:

a.    defraud the United States by impeding, impairing, obstructing, and defeating the lawful functions of HHS, through its agency CMS, in the administration of Medicare, by deceit, craft, and trickery; and

b.      commit the following offenses against the United States:

i.      making false statements relating to health care matters, in violation of 18 U.S.C. § 1035;

ii.     health care fraud, in violation of 18 U.S.C. § 1347;

iii.    soliciting and receiving remuneration (kickbacks and bribes), in violation of 42 U.S.C. § 1320a-7b(b)(1); and

iv.     offering and paying remuneration (kickbacks and bribes), in violation of 42 U.S.C. § 1320a-7b(b)(2).

## C.     **Manner and Means of the Conspiracy**

39.     The manner and means by which the defendants and their conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

a.      It was part of the conspiracy that the Truglia Faction conspirators would and did run a telemarketing operation using multiple corporate entities, including Global One, Med-Connect, and other companies, targeting the Medicare-aged population to generate DME brace orders.

b.      It was further a part of the conspiracy that the Truglia Faction conspirators would and did conceal, and caused to be concealed, that

16

c.     conspirator TRUGLIA operated, directly and through others, the telemarketing operation. The concealment included:

     i.     using "straw owners," such as TRUGLIA's sister-in-law, as the owners of record for the corporate entities that the Truglia Faction used to run the telemarketing operation; and

     ii.     directing "straw owners" and others to maintain licenses—such as a Florida Commercial Telephone Seller Business License—and other required business documents to keep the telemarketing operation running.

d.     It was further a part of the conspiracy that, to target Medicare beneficiaries, the Truglia Faction would and did obtain personally identifying information or "PII"—such as names, dates of birth, and/or Medicare ID numbers—for the Medicare-aged population, including by purchasing PII from known "lead generators."

e.     It was further a part of the conspiracy that Med-Connect representatives would and did call, or purport to call, Medicare beneficiaries to inquire about, among other information, the beneficiaries' Medicare eligibility, their health status, and whether they wanted DME braces.

f.      It was further a part of the conspiracy that Med-Connect representatives would and did make written electronic records of the calls, and purported calls, to Medicare beneficiaries to build DME brace orders.

g.      It was further a part of the conspiracy that, through automation and other electronic means, the Truglia Faction conspirators would and did cause the transmission of Medicare beneficiaries' DME brace orders to medical practitioners through purported "telemedicine" vendors.

h.      It was further a part of the conspiracy that the Truglia Faction conspirators would and did offer and pay illegal bribes through intermediaries to medical practitioners to induce them to sign and to prescribe the DME brace orders under the guise of "telemedicine."

i.      It was further a part of the conspiracy that, often, the medical practitioners would and did sign the DME brace orders without ever contacting the Medicare beneficiaries, rather than conducting compliant telehealth consultations as required.

j.      It was further a part of the conspiracy that the purported "telemedicine" vendors would and did electronically transmit, or cause the transmission of, signed DME brace orders, which were secured through illegal bribes (the "illegal DME claims"), to the Truglia Faction conspirators.

k.    It was further a part of the conspiracy that the Truglia Faction and the Regency Faction conspirators would and did acquire and create at least five DME Fronts for the purpose of, among others, spreading illegal DME claims across several entities to evade Medicare scrutiny.

l.    It was further a part of the conspiracy that one or more of the Truglia Faction and the Regency Faction conspirators would and did conceal from Medicare and others, that conspirator TRUGLIA, in whole or in part, owned, controlled, held financial interests in, and/or managed the DME Fronts. The methods of concealment included:

i.    falsely and fraudulently listing TRUGLIA's wife, C.T., as the sole owner of the Truglia Faction's DME Fronts in Medicare enrollment applications (i.e., Forms CMS-855S) and other documents;

ii.    making or causing to be made false and misleading statements during inspections and related follow-up for and on behalf of Medicare about the ownership and management of the Truglia Faction's DME Fronts;

iii.    opening bank accounts for the Truglia Faction's DME Fronts (hereinafter, the "DME Front Bank Accounts") using only the names and identities of straw owners as authorized signors;

    iv.   mimicking, or causing to be mimicked,

signatures of the straw owners, including through forgery and other means, to

conduct financial transactions using funds in the DME Front Bank Accounts;

and

    v.   providing TRUGLIA online access to the

DME Front Bank Accounts to conduct financial transactions.

   m.  It was further a part of the conspiracy that one or more

Regency Faction conspirators would and did create, or cause to be created, a

fake, non-operational DME drop-shipping company named "Magic Medical."

   n.  It was further a part of the conspiracy that, to dupe

inspectors so as to secure Medicare-billing privileges for the DME Fronts, the

Regency Faction and the Truglia Faction conspirators would and did:

    i.   execute sham inventory contracts between

some or all of the Truglia Faction's DME Fronts and Magic Medical;

    ii.   create bogus patient records for fictitious

patients for some or all of the Truglia Faction's DME Fronts; and

    iii.   present, or cause the presentation of, sham

inventory contracts, bogus patient records, and other false and misleading

information during and in connection with inspections.

o.     It was further a part of the conspiracy that the Truglia Faction conspirators would not and did not collect copayments from Medicare beneficiaries.

p.     It was further a part of the conspiracy that the Truglia Faction and the Regency Faction conspirators would and did direct, or cause to be directed, Medicare and CHAMPVA payments for the illegal DME claims to the DME Front Bank Accounts.

q.     It was further a part of the conspiracy that, through Global One, the Truglia Faction conspirators would and did sell and offer to sell illegal DME claims for submission to Medicare and other federal health benefit programs to other DME-front owners for up to $300 per brace.

r.     It was further a part of the conspiracy that one or more of the Truglia Faction conspirators would and did submit, or cause the submission of, over approximately $25 million of illegal DME claims to Medicare and other federal health benefit programs, including CHAMPVA, through the Truglia Faction's DME Fronts (i.e., Indian Shores Bracing, Self-Care Bracing, Cordial Medical, Village Medical, and Tiger Medical), resulting in payments of at least approximately $10 million.

s.     It was further a part of the conspiracy that one or more of the Truglia Faction conspirators would and did transfer, or cause the transfer

of, millions of dollars from the DME Front Bank Accounts to other accounts, including the ASP Marketing bank account (BOA -7706) held or controlled by conspirator TRUGLIA, C.T., and others, to promote and to perpetuate the scheme and for other purposes; and

t.     It was further part of the conspiracy that the conspirators would and did participate in meetings, perform acts, and make statements to accomplish the objects of and to conceal the conspiracy.

### D.     Overt Acts

40.     In furtherance of the conspiracy, and to effect its objects, the defendants and other conspirators committed the following overt acts, among others, in the Middle District of Florida and elsewhere:

*The Truglia Faction's Telemarketing Operation*

a.     On or about April 24, 2018, the Truglia Faction conspirators submitted, or caused the submission of, a renewal application for a Florida Commercial Telephone Seller Business License Application, for the entity known as Med-Connect in the name of its straw owner, E.T.

b.     On or about May 8, 2018, conspirator FERNANDEZ submitted an application for a Florida Commercial Telephone Salesperson Individual License for and in connection with her purported employment at Med-Connect.

c.    On or about April 2, 2018, conspirator TRUGLIA exchanged an email with Truglia Faction conspirator L.M. tracking the weekly "brace count" for the call-center representatives at Med-Connect;

d.    On or about the dates set forth below, each of which constitutes a separate overt act, one or more Truglia Faction conspirators paid, or caused to be paid, illegal bribes in the approximate amounts listed below to purported "telemedicine" vendors and their intermediaries to induce medical practitioners to sign and to prescribe DME brace orders:

| Overt Act | On or About Date | Source Account | Approx. Amount |
|---|---|---|---|
| d.1 | October 5, 2018 | Global One (BOA -1181) | $65,835 |
| d.2 | November 2, 2018 | Global One (BOA -1181) | $101,024 |

*The Truglia Faction's DME-Front Operation*

e.    On or about the dates set forth below, each of which constitutes a separate overt act, one or more Truglia Faction conspirators transferred, or caused the transfer of, funds from bank accounts under their control to accounts maintained and controlled by the Regency Faction conspirators to purchase DME Fronts:

| Overt Act | On or about Date | Source Account | Approx. Amount | DME Front |
|---|---|---|---|---|
| e.1 | January 16, 2018 | Global One (BOA -1181) | $30,000 | Indian Shores Bracing |
| e.2 | July 9, 2018 | ASP Marketing (-7706) | $30,000 | Indian Shores Bracing |
| e.3 | July 23, 2018 | ASP Marketing (-7706) | $30,000 | Self-Care Bracing |
| e.4 | August 14, 2018 | Global One (BOA -1181) | $30,000 | Cordial Medical |
| e.5 | September 19, 2018 | ASP Marketing (-7706) | $30,000 | Self-Care Bracing |

| Overt Act | On or about Date | Source Account | Approx. Amount | DME Front |
|---|---|---|---|---|
| e.6 | September 28, 2018 | ASP Marketing (-7706) | $30,000 | Village Medical |
| e.7 | December 28, 2018 | Global One (BOA -1181) | $30,000 | Village Medical |
| e.8 | January 22, 2019 | Indian Shores (BOA -9517) | $30,000 | Cordial Medical |

      f.      On or about the dates set forth below, each of which constitutes a separate overt act, one or more Truglia Faction and/or Regency Faction conspirators signed, or caused the signing of, Forms CMS-855S (meaning the Medicare enrollment applications), for the DME Fronts, which, among other things, bound the DME suppliers and their officials to abide by all "laws, regulations, and program instructions" for Medicare, including "the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b)":

| Overt Act | On or about Date of Signature | DME Front |
|---|---|---|
| f.1 | February 28, 2018 | Indian Shores Bracing |
| f.2 | October 10, 2018 | Village Medical |
| f.3 | October 13, 2018 | Cordial Medical |
| f.4 | April 4, 2019 | Self-Care Bracing |
| f.5 | March 25, 2019 | Tiger Medical |

      g.      On or about January 13, 2018, conspirator TRUGLIA emailed conspirator K.W., directing K.W. to remove his name from a "Medicare Part B Start Up Agreement" and to replace it with "C.T.," stating "[i]t will be under [C.T.'s] name."

      h.      On or about February 1, 2018, conspirator K.W. executed, or caused the execution of, a sham contract between Indian Shores Bracing and the fake, non-operational drop-shipping company Magic Medical.

i.     In or about February 2018, one or more Truglia Faction and Regency Faction conspirators submitted, or caused the submission of, a Form CMS-855S to Medicare falsely reporting, among other information, that C.T. was the sole owner of Indian Shores Bracing.

j.     On or about April 22, 2018, conspirator TRUGLIA asked conspirator K.W. whether she had "any other available DMEs for sale."

k.     On or about July 10, 2018, conspirator TRUGLIA emailed conspirator K.W. stating: "Are any other DMEs available for purchase. 1 will not handle all my business."

l.     On or about July 27, 2018, conspirators FERNANDEZ and K.W. exchanged emails about how many braces to submit per DME Front. FERNANDEZ asked: "When can we start submitting 400 braces or more?" K.W. responded: "As far as the number of bracing I think 250-300 is a comfortable number."

m.     In or about August 2018, conspirator TRUGLIA hand-delivered $5000 in cash to conspirator K.W. at a health care conference.

n.     In or about September 2018, one or more Truglia Faction and Regency Faction conspirators signed, or caused the signing of, a sham "stock purchase agreement" to transfer control of Self-Care Bracing from Regency to the Truglia Faction in exchange for approximately $60,000.

o.    In or about December 2018, one or more Truglia Faction and Regency Faction conspirators presented, or caused to be presented, false and misleading information and records to a BOC inspector during an inspection of Indian Shores Bracing.

p.    In or about December 2018, one or more Truglia Faction and Regency Faction conspirators maintained, or caused to be maintained, on-site at Indian Shores Bracing a purported compliance document titled the "Dos and Donts of Marketing," which stated, in part, that the "Medicare Anti-Kickback Statute ... makes it a felony to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce a person or entity to refer an individual for an item or service covered by a federal health care program."

q.    In or about March 2019, during and in connection with an on-site inspection of Indian Shores Bracing, the Truglia Faction conspirators concealed, or caused the concealment of, conspirator TRUGLIA's ownership, control, and management of the Truglia Faction's DME Fronts.

r.    In or about March 2019, one or more Truglia Faction and Regency Faction conspirators signed, or caused the signing of, a sham "stock purchase agreement" to transfer control of Tiger Medical from Regency to the Truglia Faction in exchange for approximately $40,000.

s.    In or about April 2019, conspirators FERNANDEZ and K.W. exchanged multiple texts regarding the Truglia Faction's interest in acquiring and creating additional DME fronts with the Regency Faction conspirators, stating, in pertinent part, as follows:

FERNANDEZ:    "Pat wants another DME as soon as possible ... and we want 4 more DME's, not just 1."

K.W.:    "do u want us to start 2 in [C.T.'s] name. Cheaper investment ... and then sell 2 to you guys?"

FERNANDEZ:    "awesome and I'm gonna find out about [C.T.'s] name."

FERNANDEZ:    "Pat said he wants to do what you said and start 2 in [C.T.'s] name and buy 2 ready. 4 total."

t.    On or about the dates set forth below, each of which constitutes a separate overt act, one or more Truglia Faction and/or Regency Faction conspirators submitted, or caused the submission of, illegal DME claims that had been procured through illegal bribes to Medicare:

| Overt Act | On or about Date Submitted | Beneficiary | Approx. Amount Paid | Claim Number | Truglia Faction DME Front |
|---|---|---|---|---|---|
| t.1 | September 26, 2018 | K.L.T. | $1,681.98 | 18269714940000 | Self-Care Bracing |
| t.2 | November 27, 2018 | J.L.L. | $1,414.82 | 18331715901000 | Indian Shores Bracing |
| t.3 | December 13, 2018 | C.D.M. | $1,510.07 | 18347748710000 | Indian Shores Bracing |
| t.4 | March 19, 2019 | J.C.N. | $1,570.58 | 19078741518000 | Cordial Medical |
| t.5 | March 20, 2019 | A.L.F. | $2,270.36 | 19079732967000 | Village Medical |

u.    On or about the dates set forth below, each of which

constitutes a separate overt act, one or more of the Truglia Faction

conspirators transferred, or caused the transfer of, funds from bank accounts

under their control to the ASP Marketing bank account (BOA -7706):

| Overt Act | On or about Date | Source Account | Approx. Amount |
|---|---|---|---|
| u.1 | October 15, 2018 | Indian Shores (BOA -9517) | $100,000 |
| u.2 | December 4, 2018 | Indian Shores (BOA -9517) | $76,000 |
| u.3 | December 12, 2018 | Self-Care Bracing (JPMC -0275) | $50,000 |
| u.4 | January 2, 2019 | Indian Shores (BOA -9517) | $100,000 |
| u.5 | March 5, 2019 | Village Medical (BOA -8232) | $40,600 |
| u.6 | March 21, 2019 | Self-Care Bracing (JPMC -0275) | $75,000 |

v.    In or about March 2019, the Truglia Faction conspirators

forged, or caused the forgery of, conspirator K.W.'s signature onto checks for

the Self-Care Bracing bank account (JPMC -0275) to transfer approximately

$163,050 in funds to the ASP Marketing account (BOA -7706).

All in violation of 18 U.S.C. § 371.

## COUNTS TWO THROUGH SIX
### (False Statements Relating to Health Care Matters)

1.    The Grand Jury realleges and incorporates by reference the

paragraphs contained in Section A of Count One of this Indictment as though

fully set forth herein.

2.    On or about the dates set forth below in each count, in the

Middle District of Florida, in a matter involving a health care benefit program,

that is, Medicare, the defendants,

28

PATSY TRUGLIA, and
RUTH BIANCA FERNANDEZ,

aided and abetted by each other, and others, including K.W., S.P., and M.K.,

did knowingly and willfully make a materially false, fictitious, and fraudulent

statement and representation to Medicare in a submitted CMS Form-855S, as

reflected below in each count, in that, the submitted CMS Form-855S stated

and represented to Medicare that C.T. was the sole person who owned,

controlled, held financial interests in, and/or managed the listed DME Front,

when in truth and in fact, as the defendants then and there well knew, C.T.

was not the sole person who owned, controlled, held financial interests in,

and/or managed the listed DME Front:

| COUNT | On or about Date of CMS Form-855S Submission | DME Front | Listed Owner(s) |
|-------|------------------------------|-----------|-----------------|
| TWO | February 28, 2018 | Indian Shores Bracing | C.T. |
| THREE | October 10, 2018 | Village Medical | C.T. |
| FOUR | October 13, 2018 | Cordial Medical | C.T. |
| FIVE | April 4, 2019 | Self-Care Bracing | C.T. |
| SIX | March 25, 2019 | Tiger Medical | C.T. |

In violation of 18 U.S.C. §§ 1035 and 2.

## COUNTS SEVEN THROUGH ELEVEN
### (Health Care Fraud)

### A.    Introduction

3.    The Grand Jury realleges and incorporates by reference the paragraphs contained in Section A of Count One of this Indictment as though fully set forth herein.

### B.    The Scheme

4.    Beginning in or about January 2018, and continuing until in or about April 2019, in the Middle District of Florida and elsewhere, the defendants,

PATSY TRUGLIA, and
RUTH BIANCA FERNANDEZ,

aided and abetted by each other, and others, including K.W., S.P., and M.K., did knowingly and willfully devise and intend to devise a scheme and artifice to defraud a health care benefit program, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a health care benefit program.

### C.    The Manner and Means of the Scheme

5.    The manner and means of the scheme and artifice is described in Section C of Count One of this Indictment, and the Grand Jury realleges and incorporates by reference that section as though fully set forth herein.

### D.    Execution of the Scheme

6.    On or about the dates set forth below in each count, within the Middle District of Florida and elsewhere, the defendants, aided and abetted by each other, and others, did knowingly and willfully execute and attempt to execute the aforesaid scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses and representations, money under the custody and control of a health care benefit program, that is Medicare, in connection with the delivery of and payment for health care benefits, items, and services, in the submission of the below claims to Medicare:

| COUNT | On or about Date Submitted | Beneficiary | Approx. Amount Paid | Claim Number | DME Front |
|---|---|---|---|---|---|
| **SEVEN** | September 26, 2018 | K.L.T. | $1,681.98 | 18269714940000 | Self-Care Bracing |
| **EIGHT** | November 27, 2018 | J.L.L. | $1,414.82 | 18331715901000 | Indian Shores Bracing |
| **NINE** | December 13, 2018 | C.D.M. | $1,510.07 | 18347748710000 | Indian Shores Bracing |
| **TEN** | March 19, 2019 | J.C.N. | $1,570.58 | 19078741518000 | Cordial Medical |
| **ELEVEN** | March 20, 2019 | A.L.F. | $2,270.36 | 19079732967000 | Village Medical |

In violation of 18 U.S.C. §§ 1347 and 2.

## COUNTS TWELVE AND THIRTEEN
### (Offering and Paying Remuneration—Kickbacks and Bribes)

### A.   Introduction

1.     The Grand Jury realleges and incorporates by reference the paragraphs contained in Section A of Count One of this Indictment as though fully set forth herein.

### B.   Offense

2.     On or about the dates listed below in each count, in the Middle District of Florida and elsewhere, the defendants,

PATSY TRUGLIA, and
RUTH BIANCA FERNANDEZ,

did knowingly and willfully offer and pay remuneration (including kickbacks and bribes) in the approximate amounts listed below, directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person (A) to refer an individual to a person for the furnishing and arranging for the furnishing of an item and service, and (B) to purchase, order, and arrange for, and recommend purchasing and ordering a good, service, and item, for which

payment may be made, in whole and in part, under a federal health care program, that is, Medicare:

| COUNT | On or About Date | Source Account | Approx. Amount |
|---|---|---|---|
| TWELVE | October 5, 2018 | Global One (BOA -1181) | $65,835 |
| THIRTEEN | November 2, 2018 | Global One (BOA -1181) | $101,024 |

In violation of 42 U.S.C. § 1320a-7b(b)(2) and 18 U.S.C. § 2.

## FORFEITURE

1.    The allegations contained in Counts One through Thirteen of this Indictment are realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of 18 U.S.C. § 982(a)(7).

2.    Upon conviction of any or all of the violations alleged in Counts One through Thirteen, the defendants shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(7), any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of the offenses.

3.    The property to be forfeited includes, but is not limited to, a judgment in the amount the defendants obtained as a result of the commission of the offenses, and the following assets which constitute proceeds traceable to the commission of the offenses:

        a.    approximately $160,531.10 seized from Bank of America account 898095299517 held in the name of Indian Shores Bracing Inc;

b.  approximately $108,342.34 seized from Bank of America account 229057958245 held in the name of Cordial Medical Supply;

c.  approximately $156,924.44 seized from Bank of America account 229057958232 held in the name of Village Medical Supply, Inc.;

d.  approximately $26.68 seized from Bank of America account 356578556 held in the name of Tiger Medical, Inc.;

e.  approximately $8,521,176.71 seized from Bank of America account 229053747706 held in the name of ASP Marketing Group, LLC;

f.  approximately $221,116.79 seized from Bank of America account 898085651181 held in the name of Global One Medical Solutions, LLC;

g.  approximately $123,317.80 seized from JPMorgan Chase Bank account 276100275 held in the name of Self-Care Bracing;

h.  approximately $274,699.99 held by CMS for fraudulent claims submitted by Cordial Medical Supply;

i.  approximately $418,631.36 held by CMS for fraudulent claims submitted by Indian Shores Bracing;

j.  approximately $452,638.56 held by CMS for fraudulent claims submitted by Self-Care Bracing, Inc;

k.  approximately $150,632.12 held by CMS for fraudulent claims submitted by Tiger Medical, Inc.; and

l.  approximately $558,476.38 held by CMS for fraudulent claims submitted by Village Medical Supply.

4.  If any of the property described above, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute

property under the provisions of 21 U.S.C. § 853(p), as incorporated by

18 U.S.C. § 982(b)(1).

A TRUE BILL,

_____
Foreperson

MARIA CHAPA LOPEZ
United States Attorney

By: _____
Kristen A. Fiore
Assistant United States Attorney

By: _____
Jay G. Trezevant
Assistant United States Attorney
Chief, Economic Crimes Section

No.

# UNITED STATES DISTRICT COURT
## Middle District of Florida
### Tampa Division

## THE UNITED STATES OF AMERICA

vs.

## PATSY TRUGLIA, and
## RUTH BIANCA FERNANDEZ

## INDICTMENT

Violations:   18 U.S.C. §§ 371, 1035, 1347
                 42 U.S.C. §§ 1347, 1320a–7b(b)(1), 1320a–7b(b)(2)

A true bill,

_____
Foreperson

Filed in open court this 11th day

of February 2020.

_____
Clerk

Bail $_____